```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Edward J. Fowler,                :

    Plaintiff,              :

  v.                             :       Case No. 2:14-cv-277

Commissioner of Social Security,
                                         Magistrate Judge Kemp
    Defendant.              :

OPINION AND ORDER

## I. Introduction

Plaintiff, Edward J. Fowler, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income. That application was filed on January 26, 2011, and alleged that Plaintiff became disabled on June 4, 2009.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on November 13, 2012. In a decision dated November 30, 2012, the ALJ denied benefits. That became the Commissioner's final decision on January 29, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 13, 2014. Plaintiff filed a statement of specific errors on August 5, 2014, to which the Commissioner responded on November 6, 2014. Plaintiff did not file a reply brief, and the case is now ready to decide.

## II. Plaintiff's Testimony at the Administrative Hearing

Mr. Fowler was 50 when the administrative hearing was held. He is a high school graduate who took special education classes and has difficulty reading. He testified to the following at the administrative hearing (see Tr. 113-43).

Plaintiff had worked in the past as a housekeeper at a county home. As of the time of the hearing, he was living by himself. His daughter or girlfriend helped him with shopping; sometimes he did not go into the store due to pain in his feet. He did not experience that pain when he was working. He stopped working because he had difficulty getting up and moving in the morning, problems he attributed to his asthma and bronchitis. Also, the exposure to chemicals, particularly cleaners, made it hard for him to breathe. He did have a job in the 1980s which required constant use of his hands, and that caused them to crack and bleed.

Plaintiff said that he refiled for SSI (he had been denied such benefits shortly before his current application was filed) because his feet, hands, and breathing had all gotten worse. He stopped smoking about three months before the hearing. Cold weather made his breathing worse. His hands and feet dried out constantly and cracked and bled. Detergents or bleach were a problem for him. He had done some walking for exercise but had to quit due to problems with his feet and knees. He had not exercised since January of 2011. On a typical day, Plaintiff was on his feet for a few hours. He had arthritis in his shoulder which limited his lifting.

### III.  The Medical Records

The medical records in this case are found beginning on page 402 of the administrative record. They are voluminous. The Court's summary of them will concentrate on the records which, based on Plaintiff's statement of errors, Plaintiff deems the most significant. The evidence submitted after the ALJ's decision will be discussed, briefly, in connection with Plaintiff's request for a sentence six remand.

As to leg and ankle pain, Plaintiff was seen in the emergency room of Genesis Good Samaritan Hospital in January,

-2-

2011.  His chief complaint was right ankle pain.  It had steadily worsened since he was walking and jogging at the fairgrounds, but he did not seek medical help for financial reasons.  The pain had not responded to over-the-counter medications.  An x-ray was negative, but he was given medication and told to follow up with his primary care physician.  (Tr. 570-72).  There do not seem to be any records indicating that he did so.  Rather, he seems to have sought care periodically for other problems from the same emergency department.

Plaintiff was back in the emergency room on April 12, 2012, this time with a complaint of foot pain, which he described as a new problem which had been gradually getting worse and included limitation of range of motion and stiffness.  Activity aggravated his symptoms.  His foot was tender but not swollen.  An x-ray taken at that time was compared with the one taken in January, 2011, and it showed some thickening along the plantar aponeurosis, possibly fasciitis.  It was noted that he had an appointment scheduled with a podiatrist, Dr. Skrobot.  (Tr. 954-61).

Dr. Skrobot saw Plaintiff on May 23, 2012, and again on June 6, 2012.  The note from that latter visit indicated that Plaintiff reported shooting, aching, sharp foot pain and that he was being treated for a spur on the right foot as well as cracking of the skin.  The spurring was confirmed by x-ray (the one taken on April 12, 2012) and Dr. Skrobot observed fissuring of the skin.  He also listed an impression of plantar fasciitis bursitis on the right.  (Tr. 1046).  Plaintiff was still having heel pain on August 1, 2012, which had not been relieved by taping or medication.  He was having difficulty "getting around." Pain and dysfunction of the right foot was noted, and Dr. Skrobot administered an injection in the right ankle, noting that a brace might be required if the problem did not improve.  (Tr. 1082).

Dr. Skrobot did prescribe foot inserts for arch support. (Tr. 1084). Concurrent with this treatment, Plaintiff was receiving treatment for his skin problems, both on his feet and elsewhere, also apparently without much relief. See, e.g., Tr. 1099-1100.

Dr. McKee, the final state agency physician to review the records concerning physical impairments, did so on September 14, 2011, so he did not have the benefit of any of this information apart from the January, 2011 emergency room note. He concluded that Plaintiff could do a fairly full range of light work, including standing and walking for six hours in a work day, reduced by the need to avoid climbing ladders and various environmental conditions. (Tr. 203-05). As noted below, the ALJ gave this opinion some weight but reduced Plaintiff's residual functional capacity slightly, limiting him to four hours of standing and walking, and only two hours at a time.

### IV. The Vocational Testimony

Elizabeth Laflamme was the vocational expert in this case. Her testimony begins at page 143 of the administrative record.

Ms. Laflamme first testified that Plaintiff's past relevant work as a housekeeper was light and unskilled. It required at least six hours of standing or walking per day, if not more.

She was then asked to testify about a hypothetical individual who could do light work but could not climb ladders, ropes, or scaffolds. The person could not tolerate even moderate exposure to extremes of temperature, wetness, humidity, irritants, fumes, odors, dusts, gases, and unventilated areas. The person was also limited to simple, repetitive, routine work in a low-stress environment with only occasional interactions with others. She said that such a person could not be a housekeeper, but could perform other light jobs like bottle line worker, small products assembler, and machine tender.

Next, the ALJ asked Ms. Laflamme if those jobs could still

be done by someone limited to four hours of standing or walking. She said they could not, but someone with that additional limitation could work as a school bus monitor, embroidering machine operator, or price marker. She also testified that if a person could stand or walk for six hours, but for only an hour at a time, the person could not do any of the jobs she identified. However, the last three jobs could be done by someone who could stand or walk for two hours at a time.

V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 89-101 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since his application date of January 6, 2011. The ALJ also found that Plaintiff had a limited education, was literate, and was able to communicate in English (a finding which precluded Plaintiff from qualifying for benefits under the Medical-Vocational Guidelines). Going to the next step of the sequential evaluation process, the ALJ determined that Plaintiff had multiple severe impairments including bronchial asthma, tobacco addiction, obesity, psoriasis, hyperkeratosis of the hands and feet, mycotic nails, plamarplantar deraderma, eczematous dermatitis of the hands, GERD, plantar fasciitis, bursitis, major depressive disorder, attention deficit disorder, dependent personality disorder, history of alcoholism, and borderline intellectual functioning. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level but he could only

stand or walk for four hours a day with a maximum of standing or walking for two hours at a time.  He could not climb ladders, ropes, or scaffolds and could not tolerate even moderate exposure to extremes of temperature, wetness, humidity, irritants, fumes, odors, dusts, gases, and unventilated areas.  He was also limited to simple, repetitive, routine work in a low-stress environment with only occasional interactions with the public and coworkers.

The ALJ next concluded that Plaintiff, with these limitations, could not do his past work as a housekeeper. However, Plaintiff could do other light jobs including bottle line worker, assembler of small products, and machine tender. The ALJ further found that these jobs existed in significant numbers in both the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

### VI. Plaintiff's Statement of Specific Errors

Plaintiff raises two issues in his statement of errors.  The first is that the ALJ did not have substantial evidence to support his residual functional capacity determination, primarily because he did not include restrictions arising from medical conditions which affect Plaintiff's feet, ankles, and skin.  That contention is reviewed under the following legal standard.  The Court will address separately Plaintiff's second argument, which is that the case should be remanded under 42 U.S.C. §405(g), sentence six, for consideration of new and material evidence.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.

NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

    A.   The Residual Functional Capacity Finding

As both parties acknowledge, the ALJ found that Plaintiff had several severe conditions which affect his feet and skin, including chronic skin diseases that cause thickening, cracking, and bleeding of the skin on his hands and feet, plantar fasciitis, tibial tendonitis, and bursitis.  Medical recommendations included avoiding hot water, soap, sunlight, chemicals, acidic substances and other skin irritants.  The ALJ did not make any finding about these restrictions.  Plaintiff contends not only that such findings should have been made, but that the restrictions posed to his ability to stand and walk - something the ALJ did make findings about - are not supported by the evidence.

The Commissioner responds to the first part of this argument by noting that although the ALJ made no findings about

Plaintiff's need to avoid skin irritants, any error in this regard was harmless. This is so, the Commissioner says, because none of the jobs which the ALJ said Plaintiff could do - the jobs of bottle line worker, small product assembler, and machine tender - "includes any exposure to weather, atmospheric conditions, extreme cold or heart, or toxic caustic chemicals." Memorandum in Opposition, Doc. 19, at 4, citing to the Dictionary of Occupational Titles sections on those occupations. As to the foot or ankle pain issue, the Commissioner contends that the absence of any medical opinion limiting Plaintiff to standing or walking for only one hour at a time, and the presence of opinions indicating a greater ability, plus Plaintiff's statement to his podiatrist in 2012 that he was working part-time as a landscaper, all make the ALJ's decision on this issue a reasonable one.

The Court has substantial difficulty accepting the first portion of the Commissioner's argument for several reasons. First, the Commissioner cites to evidence not of record - the DOT - to support it. Perhaps the Commissioner is asking the Court to take judicial notice of the DOT's contents. But the DOT is not, as Fed.R.Evid. 201(b)(2) requires, a source "whose accuracy cannot reasonably be questioned." An ALJ may take administrative notice not only of the DOT but other publications, and may adopt the testimony of a vocational expert who disagrees with the DOT. See generally Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994). Second, the provisions cited by the Commissioner refer mainly to atmospheric or environmental conditions and not skin irritants. It is also difficult to equate exposure to "toxic caustic chemicals" with exposure to soap and hot water. Third, the sections of the DOT which the Commissioner cites pertain to the jobs which the ALJ found that Plaintiff could perform. However, the vocational expert clearly testified that someone who could stand only four hours total in a work day could not do any of

those jobs.  See Tr. 147 ("Q: ... would any of those [jobs - bottle line worker, assembler of small products, or machine tender] remain with that reduction in the standing ability, standing and walking ability?  A.  They would not").  The record is completely silent as to how such limitations would affect the three jobs the vocational expert did identify as capable of being performed by someone with a four-hour daily standing limitation, two hours at a time.  Further, at least two of them, the jobs of embroidering machine operator and price marker, would seem to require significant use of the hands, but Plaintiff testified that when he had a factory job where he had to use his hands, he experienced cracking and bleeding.  The ALJ did not comment on this testimony or factor it, and the evidence about Plaintiff's hand condition, into his RFC determination.  Consequently, this issue alone supports a remand.

    As to the second issue, it is accurate that the state agency reviewers believed that Plaintiff could walk or stand up to eight hours in a day.  However, the ALJ found their opinions to be overly optimistic and did not give them much weight.  He basically relied on Plaintiff's testimony that he walked or tried to jog for one month before foot and knee problems made him stop, and the fact that he did some part-time landscaping work, as evidence supporting the finding that Plaintiff could stand and walk for four hours a day, and up to two hours at a time, plus his conclusion that the longitudinal medical evidence did not support a finding that Plaintiff's foot condition had worsened.  However, a fair reading of the longitudinal evidence does show worsening of those conditions; as summarized above, especially beginning in the Spring of 2012, Plaintiff reported constant sharp severe right foot pain - a new complaint - and both diagnostic tests and examinations done by Dr. Skrobot confirmed the development of new conditions which did not respond to medication or other treatment.  The new complaints post-date

Plaintiff's attempts to walk and jog for exercise, and he testified that he had to discontinue that effort due to pain. The podiatrist's note to which the ALJ referred is dated May 23, 2012, and while it states that Plaintiff was on his feet "a lot" while doing part-time landscaping work, he also said that walking made his pain worse and resting made it better.  It is a tenuous conclusion from that note alone that Plaintiff could tolerate up to four hours of standing and walking every day for a five-day work week, but in any case the ALJ's reading of the longitudinal record is not supported by substantial evidence, and a remand will give the ALJ a further opportunity to evaluate the record (and perhaps obtain a functional capacity evaluation from a treating source, which did not happen here).

B.  New Evidence

After the ALJ made his decision, Plaintiff submitted an extensive amount of new evidence, the most significant of which appears to be a psychological evaluation report from Dr. Sharma, who diagnosed a psychotic disorder and reported that Plaintiff suffered from hallucinations and delusions.  There were also additional treatment records from Dr. Skrobot indicating a worsening of Plaintiff's foot and ankle condition.  The Commissioner argues that Plaintiff did not show good cause for not obtaining the psychological evaluation in time for it to be considered by the ALJ, and that the new evidence from Dr. Skrobot would not have changed the ALJ's decision so it was not material.

When the Court decides to remand a case under 42 U.S.C. §405(g), sentence four, that determination ordinarily moots a request for a sentence six remand.  As the Court explained in Bunn v. Comm'r of Social Security, 2014 WL 644718, *9  (M.D. Fla. Feb. 19, 2014), once a sentence four remand is granted, "[t]he Commissioner should consider all of the relevant evidence on remand under sentence four."  This Court has adopted that approach in other cases.  See, e.g., Yeager v. Comm'r of Social

Security, 2010 WL 99062 (S.D. Ohio Jan. 5, 2010)(finding a sentence six remand request moot when a sentence four remand is granted).  So have other courts.  See, e.g., Falcone v. Comm'r of Social Security, 2009 WL 3241879 (N.D. W.Va. Sept. 30, 2009).  The Court will adopt that course of action here.

VII.  Decision

    Based on the above discussion, Plaintiff's statement of errors (Doc. 14) is sustained to the extent the case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion and pursuant to 42 U.S.C. §405(g), sentence four.  Plaintiff's request for a sentence six remand is denied as moot.

    /s/ Terence P. Kemp
    United States Magistrate Judge